Bernard Ryan, P. J.
Tlie New York State School for the Blind, situate at Batavia, is the successor of the New York State Institution for the Blind, which was established by chapter 587 of the Laws of 1865. The object of the institution and the provisions for its management and its administration are set forth in article 87 of the Education Law. The record of accomplishment of the school throughout its long life and under past and present management is well known. Its mission is fulfilled in daily achievement. According to the testimony in this case the record of the school is accident-free, certainly insofar as there have been previous accidents comparable to the one in suit. Indeed, in the recollection of this writer, going back more than a quarter of a century, this is the first suit against the State of New York involving this institution. However, there is an old saw to the effect that' “ accidents will happen in the best of regulated families ” and it is notable that although the pleading in this claim alleged negligence, in that “ the State of New York, its agents, servants and employees failed to provide reasonable and proper supervision and guidance ” of the claimants’ intestate, their counsel, at the conclusion of the presentation of their case and upon inquiry by the court, stated that he was not relying upon supervision, or the lack of it. The case is submitted for determination simply upon the doctrine of res ipsa loquitur.
The essential facts are not in dispute. Thomas Minotti was born March 15, 1941 with defective vision. He attended school in his home city of Elmira until he had reached the fourth grade and in September, 1953 he was admitted to the State School at Batavia, where he was assigned to the second floor of Hamilton Hall and came under the supervision of the house mother, who instructed him in personal habits, including the care of his clothing and his effects and how to bathe. With respect to bathing and the use of the bathtub, Thomas was given the instruction common to all pupils on the second floor which was that the hot water faucet was on the left and cold water on the right as one faced the faucets; that the cold water should be turned on first and hot water added; that one should not get into the tub until the water was drawn.
In June of 1954 Thomas had reached the age limit for pupils on the second floor and had qualified himself, with respect to his personal care, and otherwise, for promotion. He was *254 promoted to the first floor where he came under the jurisdiction of the house father in charge. There he bathed independently and frequently used the same bathroom which was the scene of the accident hereinafter described. Thomas was a husky boy, weighing 140 pounds. At the school he made progress. He was taught Braille and learned to operate a typewriter. He did handicraft in the shop in both metal and wood work. He went home on vacations, traveling by bus to Elmira and assisting another blind boy on the journey. At home he rode a bicycle, played baseball, walked to the store unattended, helped his father in plowing and cultivating the garden and in sawing wood. He worked at a bench and made things with his hands, using hand tools. He could watch television, view motion pictures and attend ball games.
The night of March 28, 1956 was the eve of Easter vacation and in preparation for departure to their homes many pupils availed themselves of bathing facilities that evening. The last time the house father saw Thomas prior to the accident the boy had his bathrobe on and was heading toward the water section. This consisted of three rooms, a main section wherein were stalls, toilet seats and wash bowls, a separate shower room and a cubicle wherein was a combination bathtub with overhead shower. A few minutes after the house father had seen Thomas going toward the bathroom, and at about 8:30 p.m., his attention was directed to the bathroom by another pupil. He entered and found Thomas lying naked on the floor in the main part of the bathroom, about 15 to 20 feet away from the tub in the cubicle. He had been bádly scalded. There was vapor in the bathroom. Both the cold water faucet and the hot water faucet were running into the tub. The showers were not turned on. It took two turns to turn off the hot water and approximately a quarter of a turn to turn off the cold water. An ambulance was promptly called, Thomas was taken to a city hospital where he died at 2:45 the following morning. The cause of death was third degree burns.
The hot water tank located in the basement of Hamilton Hall, which building has been occupied since 1940, has a capacity of 300 gallons and the water is heated by steam by means of a copper coil inside the storage tank. The heat control is set at approximately 160 degrees. There is no thermostatic control beyond the location of the tank itself. The next day after the accident, or at about 9 o’clock on the morning of March 29, the State’s resident engineer in charge of buildings at the Batavia School, inspected the plumbing system in Hamilton Hall. He testified that he found the temperature reading at *255 the tank was 178 degrees while the temperature at the tub was 152 degrees. The setting of the thermostat, however, which had never been replaced, remained at 160 degrees as it had been since the tank was first installed.
Another inspection was made the next day, March 30, by Dressel who was then accompanied by another State employee, one Murphy, who was in charge of all mechanical inspection in State buildings for the western New York area. On this occasion Murphy found the temperature reading on the thermometer at the tank to be 180 degrees and the hot water temperature at the bathtub, whereat the accident occurred, to be 169 degrees. Murphy testified that he could find nothing wrong with the system “ as far as the working system goes ”. Dressel, too, testified that he found nothing abnormal and that everything was functioning absolutely the way it should have been. Taken to task on cross-examination, for asserting that although there was a variance of 15 to 20 degrees, “ You say that’s a good working thermostat! ” Dressel replied, “As ■far as we know, we found the thermostat working. It was closing the valve and that’s all it could do.” He also explained that there are certain variables that would influence the situation and account for a difference in temperature between 1. the setting of the control at the tank and the thermometer at the tank and, 2. between the reading of the thermometer at the tank and the temperature at the outlet in the tub. These variables included demand on the line and the distance the water is required to travel. For example, when little water was used heat was stored up in the tank and the run-off water would be hotter. As the boys had left for vacations on the morning of March 29 very little water had been used during the 24 hours ending on the morning of March 30. There had been occasions, depending upon demand, when the water apparently had dropped many degrees below the setting of 160 at the tank because there had been complaints of insufficient hot water.
Upon the trial much time was, spent questioning witnesses about various types of thermostats, hot water control valves and installations on showers in public schools. Much of this testimony, while interesting, was quite irrelevant to the issue herein particularly as the simple facts were that the appliance in use was an ordinary bathtub with ordinary hot and cold water faucets and no mixing valve and that at the time of the accident the shower, which overhung the bathtub, was admittedly not used by the victim of the accident.
We have said that the case is submitted simply upon the doctrine of res ipsa loquitur. It is solely that, as stated at the *256 conclusion of the trial by claimant’s counsel in the following language: “ I’m relying on the fact that it was the State’s duty to furnish hot water of a degree of temperature that wouldn’t have caused — even though the youngster made a mistake, wouldn’t have caused first, second and third degree burns and in such a serious manner, over 90 per cent of his body, and I claim that it’s a res ipsa case that we’ve established. He was burned so badly that the thing speaks for itself. Something went wrong, and it’s the State’s job, not our job, to tell us what went wrong.”
This brings us to a consideration of the authorities cited by claimant’s counsel in support of his position. These are numerous. We shall mention only the foremost of them. They are Griffen v. Manice (166 N. Y. 188 [1901]); Hansen v. United Stores Realty Corp. (232 App. Div. 764 [1931], affd. 257 N. Y. 584) and Watson v. Campagnie Generale Transatlantique (147 Misc. 697 [1932]). The last-named case, although not the report of an appellate court, is important because research does not disclose that it was ever reviewed upon appeal and it is valuable because of the painstaking review by Justice Byau of the City Court of the City of New York of the authorities in point. It is particularly important because of the similarity of facts recited in the opinion to the facts in the instant case. In the Watson case plaintiff was a passenger on defendant’s ship and was in the act of talcing a bath in accommodations furnished her thereon, which accommodations she had used on several days previous to the accident. On the day in question before she had entered the bathtub plaintiff had turned on both hot and cold water faucets and let the water run. Turning off the faucets and getting into the tub she found the water not sufficiently warm and while in that position turned on the hot water faucet and almost boiling hot water came out therefrom, causing her severe burns. The jury was permitted to infer negligence and the defendant was called upon to offer sufficient explanation to rebut any inference thereof. The motion to set aside the verdict of the jury thereupon rendered was denied. The court said (p. 699): “ The water system, bathroom appliances and fixtures were in the exclusive management and control of the defendant, and it should have had knowledge of the cause of the excessive temperature of the hot water.”
The Hansen case differs from the Watson case on the facts in that in the former case the plaintiff was scalded when she turned the handle of a shower mixer to a point between “ cold ” and “warm”. However, the court in the Watson case held that that difference was “ insufficient to detract from the force *257 of the precedent.” Moreover, in the Hansen case the record discloses, in the Trial Judge’s charge to the jury, that the credible evidence on the defendant’s side showed “ That this system was originally carefully installed in accordance with the approved method and good practices, that the system was carefully watched by its employees, and inspected, and that the temperature in the non-recording thermometer on the hot water tanks was constantly read during the month before the accident and showed no dangerous degree of heat at any time, that the said system functioned perfectly for a number of months with no complaint, that for several weeks this very bathroom was used with no complaint as to imperfection and with no accident * * * and the defendant hotel keeper claims on all that that if the accident happened in the manner in which plaintiff says it did, which the defendants deny, it was unavoidable and that there was no want of ordinary care on the part of the hotel keeper * * * which caused the accident.” (See Record on Appeal, p. 756, fols. 2266-2267.)
These cases present strong arguments in behalf of the position of the claimants herein. Indeed their position may be stronger than that of the plaintiffs in the cases cited for the reason that the injured person here is deceased and the burden of establishing his contributory negligence rests with the defense. Can it be said that the State of New York has met this burden? An alert and intelligent boy of 15 is certainly sui juris and his handicap of diminished vision did not relieve Thomas Minotti from certain responsibilities particularly in view of his training and experience in self-reliance. What actually happened at the Batavia School on the night of March 28, 1956 prior to the scalding can only be surmised. Did something make Thomas Minotti forget his instructions and get into the tub before first turning on the cold water and then tempering it with the hot? Did his vision or his sense of touch fail him so that he mistakenly opened the hot water tap wider than he intended, believing that he was opening the cold water tap? The fact that he was found 15 to 20 feet away from the tub is not explained. If he got to that point by himself how was it he was not able to remove himself from the scalding water before its effects had extended to third degree burns over 80% of his entire body. The defense has not met its burden and we must refuse a finding that decedent was guilty of contributory negligence.
But did the fact that the victim of the accident was free to turn on or off the hot or cold water intervene so that it could be said that the exclusive control and management of the system *258 was not in the defendant? We understand exclusive control to be an essential element. Indeed, it is so essential an element that lack of statutory control of a bridge, completely concealed under a State-maintained highway, operated to release the State from liability to a motorist whose vehicle, suddenly and without warning, was dropped into a hole when the bridge structure failed. One would have thought that this reasonably prudent traveler, in common with all other such users of the public thoroughfare, was entitled to believe that the concrete pavement which lay ahead of him would not give way under the weight of his automobile. Not so. (Hafele v. State of New York, 274 App. Div. 1022 [1948].)
If the voluntary manual operation of the valves by the plaintiff was not an intervening control of the device in the Hansen and Watson cases (supra), similar operation by the deceased intestate in this instance cannot be invoked here to abrogate the res ipsa doctrine. Upon the foregoing considerations we must find that Thomas Minotti met his death by reason of an omission of the officers and employees of the State of New York in the care and maintenance of facilities herein-above described. We find that such omission was negligence for which there must be a recovery on behalf of those persons entitled thereto under the Decedent Estate Law.
We find special damages as follows: Funeral expenses $1,000; physician’s services $75; hospital bill $37.85; burial lot $80; marker $75; clothing $58; a total of $1,325.85. For conscious pain and suffering we award damages in the amount of $3,000 and for wrongful death the sum of $12,500.
Let judgment be entered in the total amount of $16,825.85, together with interest on $13,825.85 from March 29,1956 to the date of entry of judgment herein.